Mr. Cortman, good morning. Good morning, Your Honors. May it please the Court, my name is David Cortman and I represent the plaintiff appellant, Ms. Mary Kay Brown, in this case. I'd like to reserve three minutes for rebuttal, if I may. That's fine. Perhaps you could just clear up a procedural matter. As I understand it, in your complaint, you asked for both, you made both a facial and an as-applied challenge, but I think in the request for injunctive relief, you only limited that to the as-applied, but the District Court, as we know, went beyond that and decided the facial challenge as well. Where does that put this Court, in your view? Are we reviewing that as well, or is that just not before us at this time? I think we are reviewing that, and here's the reason why. The fact that both parties have had the ability to fully brief the facial issue before this Court, and the lower court did go ahead and rule upon it, I think this Court has the ability to go ahead and review that. And so I would say the Court can and may jurisdictionally do so. And the reason that we think it's permissible is because below, when we objected, we didn't have an opportunity to brief it. Since we came up on appeal, both sides have the opportunity. You did believe that the District Court had improperly taken up the facial attack because your P.I. motion was limited entirely to the as-applied, but now on appeal, you're content in that regard. That's right, Your Honor. Thank you. Your Honor, defendants are asking this Court to go further than any other court has ever gone in upholding free speech restrictions outside abortion. Now, is this because of the addition of the buffer? It is, Your Honor. It's both the addition of the buffer and the fact that the buffer zone is content-based, and so there's several problems presented. So does farther mean the number of square feet involved cumulatively in these various buffer zones? Well, it does, but what I was intending to mean was constitutionally permissible. I understand that, but of course the Constitution has taken form, it seems, in Madsen, Schenck, and Hill through the imposition of certain geographically or spatially placed per-foot zones. And so I did not mean my question to be one that is facetious or entirely facetious. That's what we're talking about. It is, and the reason it has, Your Honor, is when the Court has been faced with both the floating and the fixed zones, as in Madsen and Schenck, as the Court knows, it struck down one or the other. And the reason it did is that the combination of the zones burdens too much speech, and that's exactly what we have here. So if you look at Madsen and Schenck, both of those struck down the floating zones but upheld the fixed zones. And what's interesting there, those fixed zones were only upheld because there was specific blocking and violence by the defendants in that case. Does it matter at all that Madsen and Schenck were both injunctions and not statutes or ordinances as we have here? I don't think it does, and the reason, if you look at the standards for looking at an injunction and the standards for looking at a statute, the burden more speech than necessary, which was the standard used in Madsen and Schenck, is also similar to the standard of narrow tailoring that's found in Ward versus Rock against Racism. So there is a similarity, although yes, there are some differences between the two. What's interesting is the burden has been deemed by the Supreme Court to be similar. And so when it looks at whether we're looking at a statute here or the injunctions there, the burden more speech than necessary is the standard that pops up in both. And here, the problem that we have is that when you combine the two zones, as shown in the record here, it's almost impossible, as a matter of fact, to speak in this area. And the content-based zone... Tell us why. Get specific about that. Specifically, the Supreme Court in Hill, one of the reasons they upheld the floating zone there is they said the person can stand in front of the clinic entrance door without blocking and speak and hand out leaflets. That's why there was ample alternative avenues of communication. This ordinance completely wipes that out. Also, when you look... I'm at the even more basic level. I would just like to try to visualize this and have you explain the Pittsburgh Ordinance in terms of what I understand to be a 15-foot fixed buffer and the 8-foot floating buffer and where they're placed and how they interact. If you look at the three clinics here that are subject to this case, they're on city streets, downtown streets. They're not freestanding buildings, as supposed in Hill, but they're along long sidewalks. The one on Liberty Avenue, isn't it? It is not. You say freestanding buildings. That's right. In other words, these are all part of, connected with other buildings. Connected with other buildings along the avenue, I understand. You have that running across a busy downtown street. The 15-foot fixed zone at the clinics actually pushes the pro-life advocates into the street. Into the street. That's right. What is it like? A radius of 15 feet? Where you start on 15 feet on one side of the entrance to all the way around 15 feet on the other side? Where is the center point? Are we talking about 15 feet from each side of the door or is it from the middle of it? The language of the ordinance says at the entrance. I would guess that to mean you start at each side of the door and yes, you do a circle of 15 feet. A semi-circle. Semi-circle, that's right, starting with the door. That pushes pro-life advocates out into the street. When you look at the 8-foot zone. Theoretically, it could push them out into the street. Well, it does. If you were directly in front of the door. That's right. You cannot stand within 15 feet of the front entrance to any of the clinics, even though that 15 feet is in front of the neighboring stores in some of the cases. You still can't stand there, even though it's in front of a pizza place or whatever happens to be next door. Whatever happens to be next door on Liberty Avenue sometimes isn't the most savory of commercial enterprises. They are. There's pizza restaurants, there's museums, there's daycare centers. You name it. There's pornography shops within the 100-foot zone. You name it, it's there. And so you have the bustling downtown traffic, pedestrians coming and going. The 100-foot zone extends to shops in all... It's a very busy street, too, by the way, because you're taking bus traffic down all the way from Oakland and beyond, down into the downtown, using that route. That's right. And not only is it a busy street, that shows also one of the reasons your Honor's asked about what are the facts, what's really going on. The reason she cannot communicate here is because of the downtown noise. When you have an 8-foot separation, which by the way, because of the length of sidewalk, also pushes you into the street, unless you're in front of the person trying to walk backwards, as the Supreme Court said. It's hard to have a conversation 8 feet behind someone to their back. But if you're trying to be on the side of them, no one walks on the edge of the sidewalk, they walk near the middle, or anywhere else. It pushes you into the street. Into the street is the bus zone. The bus zone is not only dangerous, but it's very noisy. We have evidence in the record at sworn testimony at the hearing. We provided a DVD for noise. It is impossible to be heard in a normal conversation with the bus traffic that goes by when the abortions are being performed. Heard from where? Heard from 8 feet away that you're required to be in the floating bubble zone. In other words, the floating zone requires you to be 8 feet away from any person. And so when you put this down to rest. So, so in effect, if the person's walking in the middle of that, which is actually 15 on one side, 15 on the other, so it's 30 foot buffer, that's fine. You, you can stand there, not in the street, but on the side, and still talk with the person. But what you're saying, if the person who was going into the clinic actually moved to right where the 15 foot fixed buffer is. Then you have to add 8 feet, and then you're saying it becomes 23 feet. No, you can be outside the 15 foot zone. You cannot be in the 15 foot zone. From 15 foot to 100 feet. But I'm saying if the person was walking in, that person has. What, what, what, what person? The, the, the person who goes into the clinic, I'm sorry. You can, if you're standing still outside the 15 foot zone, you're okay. The problem with that is. Okay. It's impossible to have a conversation with someone as you're standing still, because you have about a second as they walk by. You cannot approach. You cannot approach at all. You cannot reach out to hand a leaflet. You cannot approach. And see, that's what happens on the fax. In fact, the Hill case was interesting, because it said, well, we'll see what happens in real life. We'll see what happens as applied. That's one of the reasons we focused on the preliminary injunction and the as applied challenge, because in real life, it shows her leafleting completely shut down. The, the, the Santa Hill said, there's a problem with leafleting from eight feet away. No one can handle leafleting from eight feet away. That's a fact in this case. So her leafleting is shut down. What she did before this, and don't forget this, our client has been out there for 15 years without incident. She would walk along with someone and talk to them and, and say, I love you. I care about you. We can help you. She can no longer do so. When she is eight feet away, she cannot be heard, even if she tries to walk along someone. Because either she's pushed in the street where the buses are, or she can't be heard over the noise. The leafleting is foreclosed. The conversation's foreclosed. She would stand in front of the clinics, without blocking of course, and reach people as they're about to enter, hand them a leaflet. She can no longer do that. She loses the audience that she was has been reaching for all these years. And so the combination of the two zones makes it completely impossible to speak. Does she have to ask for permission to speak? She does. And that's. No, no, I mean, is that, is that constitutionally permissible? Well, we don't think it is constitutionally permissible. The fact that you have to get permission for someone makes the speech. And yet, and yet there's good law saying that you have a right to be left alone. I mean. Well, what's interesting about that, if you look at the Hill case, they specifically did not hold that there was a right to be let alone. They heard, they held in those circumstances. It was referenced to it in the opinion. It was. And what's interesting about the holding there, it was only a facial holding. And there were seven justices who had questions about how this is going to work in real life, the four concurring justices and the three dissenting justices. And what's interesting, you talked about that eight foot zone and whether you can approach and how you have to ask consent. Seven justices questioned whether that eight foot zone is really narrowly tailored. And they said that that's left for another day. That's left for the as applied day. That's today. Because in real life, eight feet doesn't work. It works in the courtroom, where we're maybe eight feet away, but we have amplification and it's quiet in here and no one else is speaking, but out on the streets. Doesn't Ward provide, though, a good bit of play in the joints here? It says that a regulation cannot be, quote, substantially broader than necessary. It does and this is. It provides some significant play in the joints for the city here in crafting their ordinance. Well, here's what I would say, Your Honor. What's interesting is if you look at the court's jurisprudence in this area, it is never allowed what they have enacted here. If they would have gone with the Hill statute. How so? I mean, I keep going back to the various differences. Right. Both factually and spatially of these cases. How do you mean that? Well, a few different ways. Number one, the only time a fixed zone has ever been upheld by the Supreme Court is when those specific defendants were either blocking or committing violence, that's Madsen and Schenck. Everybody else were still allowed inside the zone. When you looked at the floating zone in Hill, it specifically was upheld because there was no fixed zone. When you start- You can stand right in front of the door in Hill, right? That's right. And they specifically said, and they were assuming there that the clinics were freestanding. In other words, there was just a building. And what's interesting, Your Honor, talks about the overbreath argument. Hill specifically said, well, the reason we don't think this is overbroad is because how many people are within that 100 foot zone, assuming a freestanding clinic, that have no business with the clinic? The record here is that 99 plus percent of people on the public sidewalk have no business with the clinic, yet every single one of them are regulated under this ordinance. And so its reach is tremendously broad when you look at the prior precedent. And whenever both of these combinations were put together, the court said no. You're going too far, you're burdening more streets than necessary. And that wasn't even looking at a content-based fixed zone, which we have here, because the content-based allows the clinic escorts to speak in the zone, not just to be in the zone, to speak in the zone, but not my client. Yeah, I want you to get to the, well, I want you to get to the content argument. We'll give you some more time. But before that, what did Judge Fischer, how did she deal with the spatial issues here, and the combination of the two buffers? Did she grapple with it in detail, or was it? She really did not. And what's interesting, the way she dealt with the fixed content-based zone, is completely avoided talking about it. In fact, in her opinion, she sets up the comparison between this ordinance and the statute in Hill. Side by side, columns in the record. And completely eliminated any discussion about the fixed zone. And what's interesting, that's one of the main reasons this is different from Hill. So in answer to Jana's question, she didn't deal with it all. She found it to be content neutral, first of all, because she didn't even discuss the 15 fixed zone at all. Never mind whether it was content-based or content-neutral. And then went ahead and found the ordinance to be content-neutral. Aside from the spatial part, why isn't this content-neutral? Well, because the court in Hill, and Madsen and Shank specifically said, the only way this ordinance or this type of ordinance can be content-neutral, is if they apply to everyone across the board. There's not one ordinance anywhere that's ever been upheld that allows one side of the debate to speak and the other side not. That's exactly what this ordinance does. It says- Facially? Not facially? Facially. If your honor looks at the statute, it's at JAS, the ordinance at JAS 77. It specifically says, no one can demonstrate or picket inside the 15 foot zone, obviously demonstrating a speech. And then it specifically exempts clinic agents or workers. And they actually do, according to the record, demonstrate in the zone. So that's content-based because Hill said, this is content-neutral in Hill because it applies to everybody. If those qualifiers were eliminated, would it be content-neutral in your view? If it took out all the speech aspects of that, then yes. No, no, no. If it took out the reference to the clinic workers. Would it be content-neutral? If it applied to everybody across the board, then by definition it would be content-neutral. What makes it content-based here is it allowed one side to speak. And this is, what's interesting is the defendants claim, well, they're not allowed to speak there either. But the plain reading of this ordinance says that you can picket and demonstrate, no one can picket and demonstrate except for clinic workers. So that can't be read out magically out of the ordinance. If the legislature wants to amend it, they certainly can. But the way it reads- But was that the intent? I mean, it says in the ordinance that they're trying to do a balancing between those who are going into the clinics and those who wish to exercise their rights to talk to them or counsel them if they're willing to listen. But where does it say in there that they are specifically allowing clinic workers to come out and to exercise their free speech rights? If you look at section 623.04 of the ordinance, which is on, I believe, JA 77 in the record. That section specifically says no one can congregate, demonstrate, or picket in the 15-foot fixed zone. And then the next sentence specifically exempts from this section clinic agents and workers. So the plain reading of that ordinance is no one can speak inside this zone except for clinic workers. And so on its face, it's content-based. The only way to get around that is to strike out words in there, such as the picketing and demonstrating, which are pure speech. And that's not obviously a permissible to do. It's up to the legislature to do so. And on the as-applied, on the content issue? What does the evidence show on that? As-applied, the evidence shows exactly what's consistent with the plain reading. And that is Ms. Brown's testimony in several affidavits and court testimony. Is that demonstrators are in the 15-foot zone, counseling women, telling her, don't listen to Ms. Brown. She doesn't know what she's talking about. Abortion is safe. They consistently demonstrate in the zone, as a matter of fact, as-applied. Mr. Court, Mr. Court, I would like to ask you about an issue that you have raised that relates to the as-applied claim. And that is the district judge's, apparently, sua sponte view of, speaking only for myself, of conducting a view under these circumstances without a couple of, well, first of all, doing it sua sponte with, apparently, if I understand the record correctly, no counsel along with her. And I would also assume that a court reporter is highly unusual. And, again, speaking only for myself, probably improper. What happened here and how did it contribute to the record in this case? And to what extent did Judge Fischer discuss any of her findings during that view? In the opinion that she issued. Well, we think it's very problematic for several different reasons. Number one, parties should not have to be concerned with outside evidence gathering by a judge. In this case, not only did the judge take the view without notice of the party, without anyone's presence, but the parties did not find out about that until the opinion was issued. The other thing I think that's problematic, even defendants stay in their brief twice. Well, let's stop right there. And what was that evidence? Well, the judge basically said in several footnotes in her opinion that I went down, I saw the location, I heard the noise, all those types of things. And so the evidence, the way the judge laid it out was in several footnotes, I think about four or five in her opinion. Defendants basically said that the judge made certain findings based on the evidence and based on her view. So even they admit that she went down there and gathered evidence. For example, when you're talking about the noise issue and there was unrebutted testimony that you cannot be heard on these city streets from eight feet away. Well, the court went down there, who knows what time of day, who knows what the noise was like. She could have found that there wasn't a noise problem because she went at night when it was quieter. I mean, we don't know and shouldn't have to worry about that. Should we apply harmless error analysis to this if we determine that it was error? Well, I don't think it would be harmless error for several different reasons. Number one, it's pretty clear in case law that if a judge is going to conduct a view, they should do it in the presence of the parties with notice and an ability to comment or rebut whatever evidence the judge is gathering, whatever she's viewing. The other situation is what's interesting, in combination with the view, the judge went out of her way to gather other evidence and other material outside the record. The bus schedule? The bus schedule. She cited in a footnote to say in response to the noise issue, well, anyway, there's probably less noise now because they've cut the bus schedule. Well, that wasn't in the record. It was hearsay. I don't even think it's been implemented yet. Well, isn't that a matter of public notice, the bus schedule? Well, it's not because it was an article about their plans to cut back, not the fact that it was done so or how much it was done so or where it was done so. Well, that may be in her relying on it, but I'm not so sure that that's significant. But what, to follow up on Judge Smith's question, did she use any information from this private view in a way that you challenged, that is, that might have changed the outcome of this case? We believe she did, specifically from the noise issue, from the way we read both her opinion and the defendant's brief. Well, forget about the defendant's brief. We're not reviewing that. Right. But what I'm saying is, is that was the normal. When you would read her opinion, the conclusion we came to was it affected her decision-making. Crime statistics was another thing she relied upon outside the record. And it's not that the judicial notice... Well, that's a public record as well. Well, except for it's not necessarily, I guess, what would be judicial notice of a fact, but it's how that fact affects the record. Because we don't know what was going through the judge's mind as to how that affected her opinion. If she would have said, I looked at here, the crime statistics relate to these zones are needed, we could rebut that. All right, so your point is not that it may not be in perfectly admissible evidence pursuant to judicial notice, but that you simply had no opportunity to argue it, address it, or even seek to rebut it with other evidence. Well, I would say... It just came out in the decision, is that the point you're making? That's exactly right. And the problem with judicial notice, it has to be undisputed. And the problem we have is, is how do we know how the evidence was used evidence-wise to come to the conclusion for us to say, well, no, Your Honor, that crime statistic... It doesn't have to be undisputed. It has to be not subject to some kind of reasonable dispute. I mean, someone can always argue a court should not take judicial notice, but the court may still be correctly taking judicial notice of a noticeable fact that is widely recognized in the community or otherwise. Yes, it's exactly right. The problem is the particulars of, for example, the crime statistics. Well, who conducted them? Where were they? What part of the city? What zones? Does it affect this area? We don't know any of those questions. If there's specific evidence set out by the parties, we could rebut that evidence. But if the judge is bringing in outside evidence that we don't know how it impacts, we have no ability to respond because it may affect the opinion. And the same with the notice. Anything else? Any other questions? We'll have you back on rebuttal. Thank you, Your Honor. Thank you very much. Ms. Hilton. Thank you, Your Honors. My name is Yvonne Hilton, and I represent the city defendants in this matter. Good, we'll give you some additional time as well. Thank you, Your Honors. Could you start and address the issues pertaining to the view? Sure, Your Honor. Yeah, could you raise this just a little bit? That's great. Better? Yeah. The city's position is that the judge did have an apparent power to take a view. With accompaniment, normally. I mean, you certainly have the power to take a view, but in effect, you make yourself a witness, as I think the 10th Circuit said in Lilly. And she did this with, I don't think, with any accompaniment. Is that correct? That's correct, Your Honor. Neither, we were not informed that she was going to do this. But there are a number of reasons why it is harmless error, even if you were inclined to believe that it was error. First, we can start off with that the standard in a preliminary injunction hearing is perhaps lower in terms of reliance on hearsay. But even in terms of the abuse of discretion standard that you're looking at, first, before her view, the court was fairly familiar with these areas. She lived and worked in Pittsburgh, I think, in the record it says she lived near the East Liberty Zone. So it wasn't that she perhaps never had even walked along these herself. I'm fairly familiar with them, too. I spent 14 years in the district court in that town. But that's not the point. The point you need to address is essentially the notice point being raised by your adversary. That is, just as you didn't know about it, they didn't know about it. They didn't have an opportunity to supplement the record in any way. Whether she was correct, certainly she had the power to do it, whether she erred in doing it or not, they didn't have the opportunity to supplement the record. Isn't that really the issue? Let me just give you an example. Take a look at footnote 8 where it says, this is a high crime area in East Liberty. And then, however, as a result of the view, however, since the photographs were taken in 2006, the area has changed. Well, that may be subject to debate whether that area has changed. And what the changes were. And what the changes were. That's correct, Your Honor. But I don't think that the actual findings that may be extrapolated from that were relevant in this, in terms of her final decision. All right. That's the harmless error analysis. Right. And I would also note that, for example, in footnote 9, J13 on the record, she specifically said that, for example, the changes in the area are not enough to disregard the photos. So she's specifically saying, well, maybe this changed, but the photos are fine. So essentially, she's herself saying. What about the noise, the noise issue? The noise issue was addressed, Your Honor, in terms of the fact that the district court agreed that the city of Pittsburgh doesn't determine where the clinics are located. The city of Pittsburgh doesn't determine how many cars or buses. We're not in control of the noise. So she didn't find it fatal to. I mean, did she rely on the lack of noise in her decision? Definitely in terms of the. In terms of people, you know, protesters or advocates. I don't believe that that was that her view and any noise you may have heard resulted in a final decision. So your view is that it wouldn't make any difference. Correct, that it was harmless error. And your scope of review, because this is a First Amendment case, your scope of review is so large that if you would find it was harmless for her to have heard that and it affected one of her findings, you would be entitled to disregard that. For example, note 15, plaintiff's Exhibit 8 provided the court with a DVD of the clinic locations evidencing the noise at the various facilities when the DVD was made in 2006. The court notes recent cutbacks by Pittsburgh court authority have in all likelihood reduced any noise. Well, I don't know. That's Soviet argument, isn't it? Perhaps it is, Your Honor, but I don't. This ordinance holds up without reliance on that. This ordinance still holds up without reliance on that one finding. Well, in fact, she really didn't draw any conclusions at all about noise, did she? The concept is introduced. The notion of noise is mentioned, I think, several places in the opinion. Clearly, it's raised here without a clear conclusion. But unless I missed something, I don't recall seeing that she ever really came to grips with it and reached any conclusions about noise. I believe, Your Honor, that she felt that that was not finally dispositive in the as-applied challenge. And that facially, that the noise issue was- Why would it not be? Given the effect of these several zones and the distance that they thereby require between the protester and the object of the protester's communication, why would noise not be a relevant or even material factor here in the ability of the protester to communicate a message on the street? Your Honor, the noise was the same before and after the enactment of this ordinance. Ms. Brown is not prohibited from going within eight feet of any willing listener. It's just the unwilling listener where she has to keep her eight-foot distance. Because this is a content-neutral ordinance, the city's not- I mean, it doesn't have to be that there's some discretion, as I believe you mentioned earlier, with respect to how narrowly tailored it has to be. We believe it is sufficiently narrowly tailored. But the noise in and of itself, it doesn't go away. Whether you're two feet away or eight feet away, there is some noise. It's not a constant- There's not a constant decibel level that never stops. It's just a matter of being in an urban downtown setting. Good. Well, there's two, as you've identified and your opponent has identified, there's two big issues here. One, is the ordinance content-neutral? And secondly, does it prohibit the kind of speech that the Supreme Court has said is permissible? And the addition of the- or the combination of the two zones. So, why don't you start with content-neutral? Of course, Your Honor. It's been argued that at least that Section 624.04, because it exempts clinic workers from the zone, that it's not content-neutral. What is your response to that? My response is that it is content-neutral. And it starts with going back to the basic law proffered by the court in Hill that talks about, well, what do you look at to determine content-neutrality? First, this ordinance does not regulate speech, only location. Secondly, it was not enacted because of disagreement with the message. And third, it furthers the city's significant goals without reference to content. Now, with respect to the exemption for police and clinic employees- While you're going back to content-neutrality, what about the argument your opponent makes that Section 623.04 allows clinic workers to come out and to make statements? The reason that that doesn't affect the content-neutrality, and I think that there is support for the position I'm going to enumerate in the McGuire line of cases and in the recently decided McCullen case, because those Massachusetts statutes, while they're different from the city's ordinance in terms of distances, both included exemptions for clinic workers. And I think that the important considerations are that, first of all, when we look at the intent of the legislature, we look at it in order to interpret it constitutionally. The second point is that the exemption deals with the job that the folks are performing, whether it's a police officer or whether it's a clinic worker. It doesn't speak to the position or viewpoint. But there's a big difference between public safety officers and employees. Yes, the clinic volunteers certainly would be more likely to perhaps have a viewpoint contrary to another person, that's trigger on, or however- Well, it's not that so much. It's that they don't- police officers represent the public. Everybody else doesn't represent the public. So it seems to me they're on a different footing here. Well, the difference is that, or perhaps something that helps with that question, is that the ordinance doesn't just exempt clinic workers. It exempts clinic workers engaged in assisting patients and other persons to enter or exit the clinic. And when you look at cases where there is a content, where they're looking at the facial, whether the ordinance is acceptable on a facial level, if there's even one reason why it can be upheld, then it should be upheld facially. And in this case, similar to the McGuire cases and the McCullen case, the reason that it should be, that there is a facial reason for city council to include that, and that is to encourage clinic workers to continue helping patients to enter clinics. And that furthers the city's significant interest in safe and unimpeded access to clinics. Well, I think, to me, that sounds quite reasonable. But it may not be constitutional. And because it does not treat everyone the same. I mean, we would argue that because the limitation is engaged in assisting patients in and out of the clinic, when you take the whole meaning, when you look at the whole meaning, it's not meant to address times when folks are congregating, patrolling, picketing, or demonstrating. It's about, perhaps, a three-second walk between the, I blew up some pictures of the clinic. I thought it might be helpful. These are all in the record. But it's about a three-second walk between the edge of the clinic and when you enter the door. And that's where the exemption is given, while they are assisting and into the clinic and out of the clinic. The clinic workers absolutely do not have any kind of buy in terms of standing in the zone in order to protest, or outside the zone in terms of the floating bubble. They are required to get consent of the patient before they approach them. They're required to get the consent of Ms. Brown if they wanted to speak with her, you know, outside of their work with the clinic. In terms of the fact that there are two zones here, both the 8-foot zone and the 15-foot zone, the city council believed that both zones were necessary to further the city's significant interest. And this isn't quite as far a stretch as appellant's council would have you believe. Clearly, the 8-foot buffer zone is almost identical to the wording in Hill. Now, the Hill ordinance also had a separate provision for hindrance and impeding access to the door. And rather than go with that, city council decided that they would have a clear, marked, fixed-foot buffer. So that would help and aid police officers in determining how close people were to the door and to make sure there weren't blocks. Police officers didn't have to determine what was hindering conduct in that case. The buffer in McGuire was what, 18 fixed and 6 floating, is that right? In McGuire? McGuire had it... McGuire's case is much different than this in the sense that... We're going to ask for a transcript of this argument, so don't stray too far from the microphone. Your words will not be recorded. Of course. Sorry, Your Honor. The McGuire case had a situation where it was an 8-foot radius in front of the door. So not much different than the city's 15-foot zone. But then within that, you have the 6-foot approach provision. So it was floating, but it's floating while other people are standing. Wherever they want, inside the door. I thought it was 18-foot. It is 18-foot rather than 15-feet. But the 6-foot floating was within that 18-feet. Oh, within the... Yes. Oh, got it. Okay. This is not within. This is outside. Right. Got it. The 8 is without. The 15 is just a fixed buffer. Does the asking for permission, does that help to... Well, and I take it in your view that that significantly helped your case. That if someone wants to speak, of course, they can go ahead and speak. But... Absolutely. I mean, there's no... Our position is that there is no regulation whatsoever on speech, just where it may occur. There's no limit on signs. There's no limit on how close you can be to a willing or consenting person once they say, yes, I'd love to talk to you. I want to know more about what you have to say. There's no 8-foot restriction at all, and you're just left with a 15-foot buffer. It only infects unwilling listeners. And, again, it's important to consider where we are. It's unwilling listeners in front of a clinic. And this is similar to the Frisbee v. Schultz case where the court said, had found that there's residential, there are privacy concerns with people being in front of your residence. And the court in this case, and, by the way, the court in that case found that even one protester or one picketer could inhibit that privacy. And that's similar to this case where you're looking at even one protester or demonstrator can inhibit one's privacy in terms of the fact that they are medically captive, so to speak. They have to go into this clinic if they want to receive the services. I'm not sure if I've answered your question correctly. No, you have. Why is the combination of, let's spend a minute on this. Why do you need, or why does the city think it needs the combination of the two zones when Hill only had one zone? Well, the two zones are needed because they work in concert to essentially do the same thing as the Hill statute did. The Hill statute had two provisions. It's just they weren't both buffer zones. In this case, we need the eight-foot floating bubble in order to balance those interests of unwanted communication. We also need the 15-foot fixed buffer to ensure clear and unpeded access to doors. And I think the real-world application was really telling in the case of Burson v. Freeman, where the court was looking at, in that case it was a fixed, it was a content-based, no less, fixed zone at 100 feet in front of a polling place. And the court said, in relying on some maybe anecdotal evidence from the lower court, they said that it takes about 15 seconds to walk 75 feet. And when you're looking at the application here, but, excuse me, but that the state of Tennessee was not incorrect in finding that the last 15 seconds before you walk into a polling place, you can be entitled to be uninterrupted. And similarly here, the zones here work together to basically say, the last three seconds before you enter a clinic, you should be able to see the door, you should be able to enter it without interruption. And before you get there, 100 feet before the clinic, you should be able to limit unwanted communication to either three or four feet away or perhaps two seconds' worth of time. And both of those work together to serve a significant interest in the safe and unimpeded access and the right to be not approached in terms of if there's an unwilling communication coming towards you and in terms of ensuring that there are even-handed, there's clear rules for the police to enforce. So there's even-handedness and there's no unequals. Does any case go as far as this one only to have a 15-foot fixed buffer and outside that 15-foot radius an 8-foot floating buffer? I'm not aware of any case that uses these exact two zones. However, again, the Hill Statute did use two provisions. It's just they chose to, the legislature chose to enact two different types of provisions that work together. Tell us again why only one of these, either the fixed zone or the floating bubble zone, would not be sufficient to protect. The floating bubble zone is needed because in terms of the legitimate interest, the significant interest that the city has expressed, we are entitled to balance the rights of the speaker with, in this captive situation, the right to have eight feet from or a distance from unwilling contact. And the 15-foot zone helps ensure the unimpeded access and the even-handed application of the law. They're both needed because they, while they work together, they serve different purposes. Your Honor, I'd like to briefly, Your Honors, I'd like to briefly also address the Minnell argument as well in terms of, is my time okay? No, go ahead. Okay. As discussed in the brief, because the city is arguing this is content neutral, it's our position that the policy on its face is fine, as the district court found, and that in order for Ms. Brown to bring Minnell liability against the city, because she did not sue either of the two officers that she alleged had interactions while she was president. I'm not sure we have any, or at least I don't think I have any questions on Minnell. Okay. Could I just ask one question or two about alternative means of communication here? What else, what alternatives were available to Ms. Brown to communicate under the strictures of the ordinance? Ms. Brown is permitted to hold signs if she would like to. Ms. Brown is permitted to hand leaflets, and she does not have to move out of the way, so she can stand directly on, as I think was discussed earlier, she could stand directly looking down the sidewalk deciding where someone was approaching. She could stand on either side and be ready with her leaflets. Can you point? I don't mean to interrupt. Go ahead. Yeah. Tell us how, on that map, where can she stand? On this map, in terms of the fixed buffer zone, she could stand right along that orange line. All right. In terms of the, and it is kind of hard to see, there's a Which puts her out in the street if she's directly in front of the door. Which puts her at the location of the woman in the blue shirt here if she was in front of the door. It is a parking lane. It's not a traffic lane, as I understand it. I guess perhaps there are times when it is a bus lane, but when there are buses coming in, she wouldn't be entitled to be able to stand there anyway. Would not be advisable. It would not be advisable, Your Honor. And then in terms of the 100-foot buffer zone, she can stand wherever she wants as long as she's eight feet away before approaching someone. But not inside the 15 feet. Not inside the 15 feet. No one can stand inside the 15-foot zone. You specifically mentioned leafleting, and that was actually what I was getting to. The court in Hill evinced a specific concern about pamphleting or leafleting, did they not? They did, Your Honor. But they were able to work their way through that concern by saying, yes, but the protester may stand right in front of the door. But wasn't that the ultimate resolution of that stated concern in Hill? Yes. Ms. Brown can't do that. What of that difference? I think it's important to remember that Ms. Brown is not the only protester at these clinics. So the city has to enact a law of general action. She's the plaintiff, however. She is the plaintiff, and she's brought in as a plaintiff. The constitutional rights that she alleges are at stake. Right. We believe that the city's significant interests justify this minor restriction on the location of her speech. It isn't exactly the same as in Hill, but it's still constitutional. She still has every – and, again, it's – as it has been said, it's – we haven't taken away any means of communication. How does she hand out a leaflet? I mean, what, does she have to wait across the street and see if she can spot the person, or what? Well, if she's – I suppose it depends on what her plans are for that morning. If she wants to stake herself in front of the door, she can decide that I'm leafletting, or if she sees someone coming. But you're saying – but she's within the 15-foot radius, so she can't stake herself in front of the door. Well – I mean, she'd have to be outside the 15-foot radius, right? On or outside, yes. I mean, she could hand pamphlets from anyone who wants to take them. And no one is forced, of course, to take a pamphlet. Anyone interested in taking her pamphlet, she certainly has the opportunity with this ordinance to offer literature. And as the court denied – as the court – as the district court stated, people are – have the choice of taking them or not. That she cannot give out the pamphlets right in front of the door, and then, again, that's assuming she wasn't blocking the entrance, does not render this statute unconstitutional. Any other questions? Good. Thank you very much, Ms. Selvin. Thank you. Mr. Cortman? There's just a few things I'd like to respond to. Hills does prove instructive because here the city has taken both zones and put them together. Hill chose not to do so, but it chose to prohibit blocking and impeding. And that's one of our points here. This ordinance, interestingly enough, is not triggered by blocking or impeding access, although that's the purpose as claimed. And that's one of the problems of why it's not narrowly tailored. All the city has to do is prohibit blocking and impeding access. Here, 50 people can block the sidewalk, not violate this ordinance. They can engage in violence and not violate this ordinance. But if one person speaks, the ordinance is triggered. That's why Hill said, we don't have to shut down the fixed zone, we just have to prohibit blocking, and that's all that this city needs to do. And, in fact, they have blocking ordinances. So it's certainly no harm to them if this ordinance is struck down because the evil is already taken care of. So if they had the 8-foot bubble and the blocking and impeding ordinance, it would be constitutional in your view? It would be constitutional, according to Hill, facially, but it would still be unconstitutional as applied because of all the differences in the clinics. They're not freestanding, all those things. But, yes, and that's because Hill upheld it, and obviously we would abide by that. But what's interesting here, when you look at all these other cases, even the McGuire v. Riley line of cases and the McCollum case, there's a few things interesting about those. Number one, they repealed the floating zone because they found it to be impossible to enforce and comply with. That's exactly one of the problems we have here. It's impossible to comply with an 8-foot floating zone as someone's moving down the street. They realized that, they repealed that part of the zone. Not only that, they had the limitations on the ordinance were only when clinic was open. This ordinance applies 24 hours a day, seven days a week, even when the clinics are closed. So it regulates 100% of speech in a 100-foot zone, even when the clinics aren't even open. So it's substantially overbroad because it covers every conversation. Yeah, but where's the damage in that circumstance? Where's the injury? The injury is in two things, and one court has called it the opposite sides of the same coin. The injury is it's not narrowly tailored as applied to the alleged evils, which are the blocking and impeding of the clinic. In other words, it has nothing to do with those two things. Also, it doesn't further those interests, which every ordinance is required. Whatever interest the government puts forth, the ordinance has to actually further those interests. This one doesn't. So if the ordinance, if the clinics are closed, it doesn't further the impeding our access to the clinics because obviously no one's going there. It also fails because of narrow tailoring. The Supreme Court has said in order to be narrow tailored, you have to focus on the specific evils and only carve out what you need to to prohibit those evils. This basically takes an elephant gun to where a scalpel is needed because it doesn't respect the free speech rights that are supposed to occur on a traditional public forum. It basically just wipes them all out and says, look, sorry, we have one interest on one side, but not on another. Whether the eight-foot floating zone works or not, that's really a legislative decision, isn't it? I mean, that's not a constitutional issue. Well, I would say it is a constitutional issue, and I would say legislatively whether they pass it or not, but constitutionally if that eight-foot zone burdens more speech than necessary, it's a constitutional issue. But yes, the amount of distance is up to them. The question is, is it constitutional as it's applied? And we would just say it's not constitutional because of the record here because it wipes out all your speech. The last thing I'd like to say, Your Honors, is... One of the arguments here is that, and you see it throughout all the cases, the legislatures or the city entities that pass these ordinances, what they're trying to do is just balance out. These are hot issues in the United States, and there are people on both sides who are really impassioned. And what they're trying to do is say, okay, look, we've got to separate them a bit, allow them to have their speech because it's important that they have that, but at the same time allow the people who are going into these clinics to have a zone where they won't be impeded or they won't be accosted. And you take these constitutional principles, which are general, and you're applying them to these specific situations. And I keep saying the intellectual answers don't really mesh. I mean, we've got something in Hill that says a certain thing, and then we've got McGuire eight feet within, or whatever, six, eight feet within an 18-foot radius. Who knows what works? The question is, is the person able to get out the type of information that she wants to communicate? And it's sort of like, what do you do? Other than you look at Mattson, you look at Schenck, and you look at Hill, and you make your best guess. The thing that makes this tough is that this is probably further than I have found anywhere else. And maybe it's just the next case at the Supreme Court. What principles would you lay out for us in writing a decision here? Forgetting that you're on one side or the other, what would be the principles, the neutral principles that you would tell us to decide this by? I would do a few things, and it is a difficult decision, and there is a balancing. You know, when I start looking at jurisprudence or free speech, I go back and look at the civil rights cases and the labor union cases. The court was so careful to make sure it didn't throw the baby out with the bathwater, so to speak. It made sure it carved out all the conduct, but it kept the speech protected in the light of atrocious activities that happened during those times. And so what I would say is we need to start with the principle that we have to protect free speech. Yes, we have to protect women, but we have to protect free speech. And so what I would say is we need to do it in a way that does the balancing Your Honor mentioned of, and I just believe this ordinance goes so far, the scale just completely skips over. But what I would say, there are ways to do it. In my opinion, the district court judge asked me, what would you do? And I laughed and said if they wanted to hire me to write their ordinance, I'd be glad to. But the short answer is stay away from speech, because this is all conduct based. These cities have an interest in stopping blocking and violence and harassment and dogging. I agree 100%. If you enact laws to prohibit those, stay away from the speaker as saying it cures the problem. Because anybody who's blocking someone or constantly dogging them, like the court said in Hill, or following them down the street, you can prohibit that. It shouldn't matter, though, what the person is saying. But the speaker here still has a right to speak. It still has a right to have leaflets that at a certain point can be handed out outside a 15-foot radius. Well, that's really the question here. On paper. What you're saying is that the ability to communicate, to speak, is impaired. Tremendously impaired, yes. And if there was a way where the speaker could still speak in real life and not just on paper and in theory, which is what we have, we have a real-life case here of what actually happens. But, yes, that's the problem. It does not allow the speaker to speak. It completely shuts down the ability to speak. But the evidence here and the opinion here demonstrates that in order to enforce the kind of regime that you've laid out here, you really have to have a constant police presence at that time. And apparently they did for a long time, and it was too costly. And they decided to deal with it in a different way. If you're lacking that constant police presence, then it's just one person's word against another. Unless maybe you could have video surveillance or something like that. It's a good point. But what's interesting about that, this ordinance still requires police presence, and here's why. An officer testified that in order for them to be able to arrest someone, they have to see someone commit the act. So what's interesting is whether it's a law about blocking or this law, it still requires the same police presence to enforce it. So it doesn't save any limited resources because it's just a different law. And both laws require police presence in order to enforce them. So I think that's one of the problems here. But I agree. And I would say the principles here in the Balancing Act, and it is a difficult area. I'm not diminishing that. But we have to make sure that we start on the side of free speech and we protect it as best we can. And I think that there are ways to protect free speech without going so far, as the city went here, to allow actual communications and actual leaflet being distributed instead of saying, well, from eight feet away I can hand you a piece of literature. All right. So let's imagine that the city has just hired you as a consultant to propose that revised ordinance. What would it be? My recommendation as a constitutional attorney would be let's prohibit all the conduct you want and let's enforce it harshly and make sure that there is no blocking, no dogging. When someone asks for, would you like a piece of literature, and someone says no, you can't stay in their face and harass them. And so there are ways to basically say it doesn't matter whether you're talking about the, you know. A basic harassment statute? Well, a dogging statute. That's the language. There's a difference between dogging and there's a difference between somebody just coming up to a person entering the clinic and starts speaking, perhaps in a very calm voice. But it may be unwanted and not liked. Now, how do we deal? Well, how is that situation dealt with? Obviously, if you have the bubble, you have to ask permission. You can't approach. You can't get three inches away from somebody's face. And the bubble completely shuts off speech, which is why an application, even under Hill, in our opinion, is unconstitutional. But I think the reason is that this is a public sidewalk. The Supreme Court has said for years we're going to hear speech we don't like. That doesn't mean someone can attack you or physically do anything to you, but we're going to hear speech we don't like. And if we get to the point where what's the difference if it's politics? Say it's the election and someone brings up a candidate and that brings up all these emotions. I know. But this is, you know, even the courts have recognized that women entering these abortion clinics are in a different situation than other patients as well as political discourse. Sure. And I think an application of laws that prohibit the conduct associated with it take care. But even under the Hill regime, if the city would have said we're copying Hill verbatim, facially, the ordinance would be upheld. Whether you agreed with it or disagreed with it is what the Supreme Court held. The problem here is that Hill said as applied there's going to be problems, so let's work them out. This record shows the as applied problems in real life. It also went beyond Hill, took a combination of two zones that the Supreme Court twice already struck down. So while there is a lot of weighing and balancing, the clear principles here show, according to the three main cases at the Supreme Court, the precedent we have to go by, this has gone too far because the last two times the court faced something similar to this, it said no, we struck one of them down, it went too far. So I would suggest as a lawyer to say let's take Hill, copy it verbatim, not add fixed zones, not add content-based, not add all these different things. We might have to make some changes because these are not freestanding clinics. They encompass pizza places and daycare centers and everything else along the way. We understand. Maybe you both will get a chance to argue this in front of the Supreme Court. Maybe so. The case was very well argued. We will take the matter under advisement. We would like to have a transcript made of the testimony. Have you shared the costs? Please check with the clerk's office. Certainly. Thank you. We'll take a short recess. Thank you, Your Honors.